a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| TOMMY LEE WILSON #077598, Plaintiff | CIVIL DOCKET NO. 5:19-CV-00845 SEC P |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| DARRYL VANNOY, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) filed by *pro se* Petitioner Tommy Lee Wilson ("Wilson").  Wilson is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  Wilson challenges his conviction and sentence imposed in the 1st Judicial District Court, Caddo Parish.

Because Wilson is not entitled to habeas relief under § 2254, the Petition should be DENIED.

I. **Background**

Wilson was convicted of three counts of first-degree murder and sentenced to life imprisonment. *State v. Wilson*, 50,589 (La.App. 2 Cir. 5/18/16); 196 So.3d 614, 616, *writ denied*, 2016-1102 (La. 5/12/17); 221 So.3d 72.

The relevant facts regarding the murders and investigation were set forth by the appellate court:

1

The victims in this case were Irene Ellison, age 78; her 41–year–old daughter, Carisa Ellison; and Carisa's boyfriend, Brian Wilson, age 58. The women lived in a three-bedroom house in the 4000 block of Gloria Drive in Shreveport with Kenneth Ellison, Irene's son and Carisa's brother. At the time of the murders, Brian was living in a shed located behind the house.

On the night of July 18, 2013, a 911 operator received a phone call from a hysterical Kenneth at about 9:30 p.m. He reported that he had just found his mother tied to a chair in her bedroom and that she had been shot. His call was transferred to the police department. While talking to an officer and walking through the darkened living room to turn on the porch lights for the emergency personnel responding to his call, Kenneth tripped over Brian's feet. Brian's body was lying partially on the couch. Kenneth told the officer that Brian had been dating his sister. Like Irene, Brian also had a bloody wound to the chest. Kenneth then found his sister lying face down on her bed in a pool of blood.

All three victims had been stabbed to death. The forensic pathologists who performed their autopsies opined that the victims' wounds were consistent with a single-edged blade, like a kitchen or steak knife. Brian had a single stab wound to the upper left chest. He also had an abrasion to his left cheek and two sharp force, incised wounds to fingers on his right hand, possible signs of a struggle with his killer. Irene, whose hands were bound behind her with an electrical extension cord, had also been stabbed in the upper left chest. After the initial penetration into her heart, the knife had been withdrawn slightly and turned; thus, there were actually two wounds to the heart wall. Additionally, Irene had a superficial, incised wound to her scalp above the right ear.

Carisa had been stabbed 13 times. Most of her wounds were to her neck, upper chest and upper back. The forensic pathologist who examined Carisa's body noted that he had seen similar injuries before, usually in domestic violence cases involving feelings of love and hate toward the victim. He especially noted that a great deal of force was used to make the deep stab wounds to Carisa's chest, which caused her lung to collapse and prevented her from breathing. A broken tooth and disarrayed clothing indicated that a fierce struggle occurred between Carisa and her killer. Her shirt was ripped, and her pants were unfastened and unzipped and partially off her waist. A blanket had been draped over her; there were no sheets on the bed.

Upon entering the residence, police officers immediately noticed a strong bleach smell. They also observed apparent bleach stains on the

2

carpet. One of the officers securing the outside perimeter of the crime scene discovered a bottle of bleach in an outside trash can. Bubbles in the bottle indicated that it had been recently shaken or dropped. Testimony adduced at trial showed that bleach degrades DNA evidence.

The crime scene was meticulously processed by crime scene investigators, who photographed, collected, and catalogued all evidence deemed relevant to the murders. There was no sign of forced entry into the Ellison residence, which was described as well maintained and nicely decorated. In fact, one crime scene investigator described the house as one of the most immaculate crime scenes he had ever seen. Due to the very clean and orderly condition of the home, it was quickly observed that one of the knives in a butcher block in the kitchen had not been properly placed in the block. Examination of this knife revealed that there was a difference in how it had been washed as compared to the other knives in the block.

Some blood drops were found in the bathroom. A plastic produce bag stained with fresh blood was discovered in the kitchen trash can. The blood was determined to be Carisa's. A partial palm print found in the blood was subsequently matched to the defendant.

The police verified Kenneth's alibi, thus eliminating him as a suspect. Due to the particular brutality of Carisa's murder, the police concluded that she was the killer's main target, and they began focusing on who would want to harm her. A neighbor who was interviewed by the police stated that, while Carisa had several male friends who visited her, the defendant stood out the most. The neighbor recounted that he had often seen the defendant hiding in the cemetery across the street and in the bushes outside the Ellison residence, watching the house. Likewise, Kenneth had unexpectedly encountered the defendant outside the house only two weeks before the murders.

The defendant was interviewed by the police on July 22, 2013, at which time he gave a recorded statement wherein he claimed that he had been at the hospital with his ill brother at the time of the murders. However, his brother told the police that the defendant was gone from the hospital between 5 p.m. and 9:30 p.m. After the bloody palm print on the plastic bag was matched to the defendant, the police obtained arrest warrants for him.

The defendant was arrested on July 26, 2013, on three counts of second degree murder. Photos taken of his right wrist and forearms showed semicircle injuries, similar to fingernail marks. Forensic analysis

matched DNA found under Brian's fingernails to the defendant. During a recorded statement given after he was advised of his Miranda rights, the defendant made numerous remarks which contradicted those in his first recorded statement. Notably, in the first interview, he initially said he had not been in the Ellison house in two months, but then changed the time period to one month. He indicated that, at that time, he had sex with Carisa at the house. During the second interview, he stated that he had been there in the last two weeks, then changed it to perhaps the week before, and he asserted that he had had sex with Carisa in her bed.

On the day of the defendant's arrest, the police were contacted by Gwendolyn Davis, who worked for the Shreveport Housing Authority. She managed the apartment complex where the defendant's brother resided. She was also a friend of Carisa. She recounted a conversation she had with the defendant just four days after the murders, in which he told her several details pertaining to the crime scene. None of these details had been released by the police to the public at the time of their conversation. Among these were the location and condition of the bodies, including the facts that Irene was tied up and that all the victims were stabbed in the chest. The defendant also claimed that he and Carisa were "special, special friends," and he became upset when Ms. Davis referred to Brian as Carisa's boyfriend. He further told Ms. Davis that Irene had banned him from her house because she thought he had cut a cord supplying electricity from the house to the shed; he denied cutting the cord. The defendant asserted to her that Kenneth was the killer.

The defendant was subsequently indicted on three counts of first degree murder. Trial was held in July 2015. The defendant testified in his own defense, denying that he harmed or killed the victims. The jury unanimously convicted him as charged on all counts. The trial court imposed the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence on each count, ordering that they be served consecutively.

*State v. Wilson*, 196 So.3d 614, 617-19 (La.App. 2 Cir. 2016).

Wilson appealed, alleging that there was insufficient evidence to convict him; the trial court erred in denying his motion for post-verdict judgment of acquittal; and the trial court erred in denying his two motions for mistrial. *Id.* The conviction and

sentence were affirmed. *Id.*; *State v. Wilson*, 221 So.3d 72 (La. 2017). Wilson did not seek further review in the United States Supreme Court.

Wilson filed an application for post-conviction relief, claiming a violation of his right to confront a witness and ineffective assistance of counsel. ECF No. 14-11 at 55. The application was denied. ECF No. 141 at 101-02. The court of appeal denied Wilson's writ application on the showing made. ECF No. 14-11 at 132. The Louisiana Supreme Court also denied writs, finding that Wilson failed to meet the standard to show ineffective assistance of counsel and failed to meet his post-conviction burden of proof. *See State v. Wilson*, 2018-1351 (La. 2019); 268 So.3d 291.

Wilson now claims that his constitutional rights were violated because he was unable to confront expert witnesses and he received ineffective assistance of counsel by his attorney's failure to object to the introduction of evidence from witnesses that did not testify at trial. ECF No. 1-2 at 6-10.

## II. Law and Analysis

### A. Rule 8(a) Resolution

The Court is able to resolve Wilson's § 2254 Petition without the necessity of an evidentiary hearing because there are no genuine issues of material fact relevant to his claims, and the state court records provide an adequate factual basis. *See Moya v. Estelle*, 696 F.2d 329, 332-33 (5th Cir. 1983); *Easter v. Estelle*, 609 F.2d 756, 761 (5th Cir. 1980); Rules Governing Section 2254 Cases.

    B.    <u>Wilson's rights were not violated under the Confrontation Clause.</u>

Wilson claims that he suffered a Sixth Amendment violation of his right of confrontation because the State presented forensic findings by experts who did not testify at trial. ECF No. 1. The State courts determined that Wilson failed to satisfy his burden of proof of a Sixth Amendment constitutional violation under Louisiana Code of Criminal Procedure article 930.2, which is an adjudication on the merits. *Woodfox v. Cain*, 609 F.3d 774, 2010 WL 2505580 at *13–14 (5th Cir. 2010) (state court's dismissal citing La. C.Cr.P. art. 930.2 is, in the absence of evidence to the contrary, an adjudication on the merits for AEDPA purposes); *Gallow v. Cooper*, 2010 WL 3522457, at *8 (W.D. La. 2010) (dismissals for failing to carry the burden of proof are considered adjudications of the merits of a habeas petitioner's claims).

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. Amend. VI. A defendant's confrontation right

is violated when the prosecution introduces "testimonial statements of a witness who did not appear at trial," unless that witness "was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

However, it is only testimonial statements that cause the declarant to be a "witness" within the meaning of the Confrontation Clause. *See United States v. Noria*, 945 F.3d 847, 851–52 (5th Cir. 2019) (quoting *Davis v. Washington*, 547 U.S. 813, 821 (2006)). The *Crawford* Court described "testimony" as "typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact," including at minimum prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and police interrogations. *See Crawford*, 541 U.S. 36, 68 (2004).

Following *Crawford*, the Supreme Court has explained that "'the basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.'" *Noria*, 945 F.3d at 8512 (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). To qualify as testimonial, "a statement must have a primary purpose of establishing or proving past events potentially relevant to later criminal prosecution." *See id.* (citations omitted). Business and public records are generally not testimonial because they are "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Id.* (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)). However, if a public record is prepared specifically for use at trial, then it is testimonial and therefore

7

inadmissible absent its creator's testimony. *Id.* at 852 (citing *Melendez-Diaz*, 557 U.S. at 324; *United States v. Duron-Caldera*, 737 F.3d 988, 994 (5th Cir. 2013)).

In *Melendez-Diaz*, the United States Supreme Court found a Confrontation Clause violation where the prosecution introduced three sworn "certificates of analysis" by forensic analysts from the state laboratory attesting that the substance analyzed was, in fact, cocaine. The forensic analysts were not called to testify in person. *Melendez-Diaz*, 557 U.S. at 308-09. In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Supreme Court found a Confrontation Clause violation where the state prosecution provided in-court testimony of an analyst about a blood alcohol test where the analyst did not perform or observe the test or sign the certification.

In Wilson's trial, two crime scene investigators with the Shreveport Police Department testified about finding a bloody produce bag with visible prints in the blood. Detective Tracy Mendels testified that she searched the kitchen and found produce bags in the trash can. ECF No. 14-9 at 143. Detective Mendels testified further that Corporal Marcus Mitchell secured the bags and photographed them. *Id.*

Corporal Mitchell testified that one of the bags had ridges of fingerprints in the blood. ECF No. 14-9 at 85. He collected the blood-stained produce bag, containing patent and latent prints. *Id.* at 109. Corporal Mitchell testified that he took photographs of the prints, which were introduced and shown to the jury. *Id.* at 111.

On cross-examination, defense counsel asked about the decision to preserve the prints on the bag versus testing the bloody prints for DNA. Corporal Mitchell explained that they prioritized preserving the fingerprint portion of the bag and

8

swabbed the blood on the bag that did not include the print. ECF No. 14-9 at 121. This allowed police to maintain the integrity of the prints. *Id.* The DNA collected from the blood on the produce bag was consistent with the DNA of the victim Carisa Ellison. ECF No. 14-10 at 19.

Sergeant Duddy was accepted as an expert in fingerprint analysis and identification. ECF No. 14-9 at 152. He participated in the investigation as a latent fingerprint examiner. *Id.* at 153. Sgt. Duddy testified that there were several prints inside the residence, including one from a produce bag. *Id.* Sgt. Duddy described the print from the bag as a patent print, which could readily be seen and did not have to be processed like latent prints. ECF No. 14-9 at 155. He compared the print from the produce bag to all victims and persons of interest. *Id.* at 153-54. Sgt. Duddy concluded that the print on the produce bag matched Wilson's print. *Id.* at 154.

Sgt. Duddy verified his finding by having other examiners conduct independent analyses of the prints in accordance with police policy and procedure. ECF No. 14-9 at 154. Sgt. Duddy testified that all fingerprint identifications in any investigation are verified at least one other time. In this case, the match was verified nine times. *Id.* at 156.

On cross-examination, Sgt. Duddy testified that the print on the bag was a partial palm print from the area under the left index finger of Wilson's left hand. Sgt. Duddy explained that palm prints are considered under the general rubric of fingerprints. ECF No. 14-9 at 156. That is, "[f]ingerprints is just a general term for

9

the science. It involves fingerprints, palm prints. But it's a general term that we use." *Id.*

Owen McDonnell ("McDonnell") also testified as an expert in crime scene investigations—specifically skin friction comparison and fingerprint analysis. ECF No. 14-9 at 164. McDonnell testified that Sgt. Duddy asked him to examine the photographs of the print. McDonnell actually asked to view the bag, which was brought to his office by Sgt. Duddy and Cpl. Mitchell. ECF No. 14-9 at 167-68. After examining the print, he determined it was from the area below the left index finger, and that it matched Wilson's print. *Id.* at 168, 174. McDonnell also verified his finding by forwarding blind, unmarked comparisons out to six other certified latent print examiners who all reached the same conclusion. ECF No. 14-9 at 168-69.

There is no support in the record for Wilson's allegation that the State introduced certificates of analysis by non-testifying experts. The State presented the testimony of the two experts who personally examined the print and concluded it was Wilson's. Both experts were cross-examined—or confronted—by Wilson at trial. The fact that Sgt. Duddy and McDonnell verified their findings with other experts establishes the thorough and conclusive nature of their findings rather than a constitutional violation.

Even if there was a confrontation error, it is subject to a "harmless error" review. *Kittelson v. Dretke*, 426 F.3d 306 (5th Cir. 2005). Such a review considers whether the constitutional error had a "substantial and injurious effect" in

10

determining the verdict. *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). "Actual prejudice" must be shown. *Id.* at 637.

Both Sgt. Duddy and McDonnell examined the prints found at the crime scene and testified to the jury that the prints matched Wilson's. Both Sgt. Duddy and McDonnell were subject to cross-examination by defense counsel. There is no indication that any of the agencies that verified the findings—Caddo Sheriff's Office, Shreveport Police Department, Mississippi State Crime Lab, West Palm Beach Police Department, Palm Beach Gardens Police Department, Jefferson Parish Sheriff's Office, and Arkansas State Crime Lab—would have testified in Wilson's favor had they been called to the stand. ECF No. 14-9 at 170. Wilson simply cannot show actual prejudice.

Because Wilson cannot establish at the ruling of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," he is not entitled to habeas relief. 28 U.S.C. §2254(d)(1) and (2).

### C. Wilson fails to state a viable claim of ineffective assistance of counsel.

Wilson claims that trial counsel rendered ineffective assistance by failing to object when the prosecution introduced certificates of analysis by print experts who did not testify at trial. The Louisiana Supreme Court found that Wilson failed to meet the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *See Wilson*, 268

11

So.3d at 291. Because Wilson's ineffective assistance claim was adjudicated on the merits in state court, he must show that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of" *Strickland*, which is the "clearly established Federal law, as determined by the Supreme Court" applicable to ineffective assistance claims. 28 U.S.C. §2254(d)(1); *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009).

To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate: (1) that his counsel's performance was deficient, requiring a showing that the errors were so serious such that he failed to function as "counsel" as guaranteed by the Sixth Amendment; and (2) that the deficiency so prejudiced the defendant that it deprived him of a fair trial. *Strickland*, 466 U.S. at 687. The first prong does not require perfect assistance by counsel; rather, a petitioner must demonstrate that counsel's representation fell beneath an objective standard of reasonableness. *Id.* at 688.

Courts must use deference in their review of attorney performance under *Strickland* to "eliminate the potential distorting effect of hindsight." *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 689). Accordingly, courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

*Strickland*'s second prong requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In other words, the petitioner must show prejudice great enough to create a substantial—rather than conceivable—likelihood of a different result. *See Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011). "Both of [*Strickland's*] prongs must be proven, and the failure to prove one of them will defeat the claim, making it unnecessary to examine the other prong." *Williams v. Stephens*, 761 F.3d 561, 566–67 (5th Cir. 2014).

This Court must review Wilson's ineffective assistance claim under a "doubly deferential" standard of *Strickland* and § 2254(d). *See Cullen v. Pinholster*, 563 U.S. 170, 190, 202 (2011); *see also Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017) ("Our federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is 'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)."). That is, on habeas review, "federal courts are to afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quotation marks omitted). The habeas court does not determine whether counsel's actions were reasonable, but rather "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

There is no support for Wilson's assertion that the State presented "certificates of analysis of other experts" to which his attorney failed to object. According to the

13

record, no certificates of analysis were introduced into evidence. Thus, there was no basis for any objection by trial counsel.

Under § 2254, counsel's performance cannot be considered deficient or prejudicial if he fails to raise a non-meritorious argument or fails to assert a frivolous objection. *See Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007) (citing *Green v. Johnson*, 160 F.3d 1029, 1037 (1998)); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997). Wilson cannot overcome the deferential habeas review of the Louisiana Supreme Court's adjudication and denial of the ineffective assistance claim.

### III. Conclusion

Because Wilson is not entitled to habeas relief, IT IS RECOMMENDED that the Petition (ECF No. 1) be DENIED and DISMISSED WITH PREJUDICE.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a circuit justice or district judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within 14 days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Wednesday, November 17, 2021.

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE